# IN THE COURT OF APPEALS OF IOWA

No. 24-1878
Filed September 4, 2025

IN RE THE MARRIAGE OF ELIZABETH LYNN TURNER
AND ROSS JEFFREY VINCENT TURNER

Upon the Petition of
**ELIZABETH LYNN TURNER, n/k/a ELIZABETH LYNN SOWERS,**
Petitioner-Appellant,

And Concerning
**ROSS JEFFREY VINCENT TURNER,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Warren County, David Faith, Judge.

A mother appeals the denial of her petition to modify the legal-custody and physical-care provisions of her dissolution decree. **AFFIRMED.**

Katie M. Naset of Hope Law Firm & Associates, P.C., West Des Moines, for appellant.

Cathleen J. Siebrecht of Siebrecht Law Firm, Pleasant Hill, for appellee.

Considered without oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**GREER, Presiding Judge.**

Elizabeth Sowers and Ross Turner divorced in 2021 after almost six years of marriage, which produced three children.  The parties agreed to joint legal custody and joint physical care of the children.  But their communication related to the children deteriorated over time, so each filed for a modification of the decree.  The district court ordered a different parenting schedule and other strategies to facilitate communication but did not change the custodial or physical-care provisions of the dissolution decree.  Elizabeth appeals, arguing that she proved a substantial change in circumstances that supported placing the children in her sole legal custody and physical care and a different parenting schedule to minimize the conflicts.  Both parents request appellate attorney fees.

We conclude the award of sole legal custody or physical care is not in the children's best interests and attorney fees are not warranted.  We affirm.

**I.  Background Facts and Proceedings.**

Elizabeth Sowers and Ross Turner married in 2015 and divorced in 2021.  They have three children—G.T., born in 2015; R.T., born in 2016; and E.T., born in 2018.  Ross has one child from a former relationship, B.T., born in 2011, who lived with Ross and Elizabeth during their marriage.

After the dissolution of the marriage, Elizabeth entered a relationship with her significant other, Kody.  They have been together for more than two and a half years and share one child, M.B., born in 2023.  Elizabeth lives with Kody, M.B., and Kody's two children, approximately five miles away from the residence where she lived at the time of the divorce.  Ross currently resides in his same home, although he moved out for a few months.  Ross has had at least two romantic

relationships since the dissolution of the marriage—Elizabeth claimed he prematurely introduced at least four women to their children in the last few years.

Both parties are employed outside the home and have been since the dissolution of their marriage. Elizabeth works a hybrid schedule, a mix of in-person and remote work, as a client manager for a company based in downtown Des Moines. She makes approximately $59,000 a year. Ross works as a safety coordinator at a lighting company, earning approximately $93,000 a year.

Elizabeth and Ross entered into a stipulated agreement to dissolve their marriage on January 20, 2021. At that time, they agreed to joint legal custody with joint physical care of their three children in a "2-2-3" schedule, where Ross had the children every Monday and Tuesday, Elizabeth had the children every Wednesday and Thursday, and the parties alternated weekends. Less than a year later, Ross sought modification of the dissolution decree, claiming there had been a substantial and material change of circumstances to warrant a modification and asking the court to award visitation rights that would not interfere with the health, education, and welfare of the children and to determine the appropriate amounts for child support, attorney fees, and court costs. Elizabeth cross-petitioned for modification; she also sought physical care of the children. Then, before trial, Elizabeth amended her application to request sole legal custody of the children. At the trial, Ross requested he be awarded physical care of the children and outlined a visitation schedule for Elizabeth.

In preparation for a hearing on the petitions for modification, the court appointed a guardian ad litem (GAL) to ascertain the best interests of the children. Attorneys for the parents and the GAL proceeded to a hearing at the district court,

where both Ross and Elizabeth testified to their experiences co-parenting, along with other witnesses. After the hearing, the GAL filed a post-trial brief, recommending, "[Elizabeth] should be awarded . . . physical care" of their three children. The GAL did not make a recommendation regarding Elizabeth's request for sole legal custody.

The district court came to an alternative conclusion. It denied Elizabeth's request for sole legal custody and both parents' request for the end of joint physical care. Instead, the court modified the parenting schedule, implementing a "one week on, one week off" schedule to minimize "mid-week handoffs" and required the parents to utilize a parenting coordinator to facilitate communication. And, as an additional communication aid, the district court ordered the parties to use a computer parenting program rather than text messages.

Elizabeth appeals, seeking sole legal custody and physical care of the children.

## II. Standard of Review.

"Actions for the modification of a dissolution decree are tried in equity," so our review is de novo. *In re Marriage of Roberts*, 954 N.W.2d 757, 760 (Iowa 2020); *see* Iowa R. App. P. 6.907. In equity cases, we give weight to the fact findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. *Roberts*, 954 N.W.2d at 760.

## III. Discussion.

**Legal Custody and Physical Care.** The district court succinctly summarized the parents' allegations against each other:

Here each party puts forth the other party's bad behavior as the purported permanent change in circumstances. While the parties in this matter do not agree on much, they agree that their communication is terrible, which is certainly supported by the voluminous record of hostile and unproductive text exchanges. The parties have struggled to reach agreement about a number of things, including but not limited to, where the children attend school, what activities the children should participate in and where, whether a medical procedure is in fact necessary, whether the children should attend counseling, when medical appointments should be scheduled, how their summer schedule and holiday schedule should be defined and followed, whether the children should have cell-phones, when school conferences should be scheduled, etc. They each point the finger at the other as the primary culprit for their mutual communication problems. The court finds they have both contributed to the problem in roughly equal measure.

In addition to communications problems, the parties testified to a laundry list of other alleged misbehaviors, including but not limited to those set forth in their competing contempt petitions. Ross accuses Elizabeth of failing to reimburse him for shared expenses, undermining his relationship with the children, as well as petty and sometimes public hostility to himself, his parents, and his significant others. Elizabeth accuses him of failing to reimburse her for insurance premiums, of making unilateral decisions on extracurriculars and medical appointments, and of failing to follow the transportation and parenting time provisions of the decree on several occasions. The court will not attempt to restate every sordid detail from the record. Suffice it to say the court finds that there is ample credible testimony that both parties have engaged in a pattern of combative and unreasonable behavior. They have both contributed to creating scenes of discord in front of their children and disrupted their children's activities by fighting publicly over trivial matters. Both have shown hostility not only to each other but to other important people perceived as being on the other parent's side, including the kids' grandparents. Both have frivolously called the police on the other multiple times, though Ross has done it more often and has also called the police on Elizabeth's parents. Ross, additionally, has engaged in bizarre behavior including faking winning the lottery—purportedly to persuade Elizabeth that he had money to fight a court battle—and recording virtually every interaction involving the children. Elizabeth has also recorded some conversations.

The district court equally attributed the communication and bad behavior to both parents. Both parents concede that their communication has been terrible

over the last few years since the dissolution was finalized. And, from our vantage point on our de novo review, it is difficult to assess if one parent is a worse offender or if the district court correctly characterized their actions. The testimony and exhibits reflect immature and petty behaviors by both parents.

To arrive at its ruling, the district court noted that Elizabeth relied upon *In re Marriage of Frazier* to argue an award of sole legal custody was the path to resolve the parental disputes. 1 N.W.3d 775 (Iowa 2024). To that point, the district court emphasized "[i]t was not [*Frazier*'s] holding that a district court's only option when confronted with parental disagreement is to award one parent sole legal custody." So, to resolve the "persistent failure to communicate," the district court utilized a different strategy to avoid future modification actions but still retain the original joint-legal-custody status, which the court believed to be in the children's best interests. And while the district court agreed that the parties' failure to communicate could "justify severing joint custody," it was "not persuaded that awarding sole custody to [Elizabeth] is the best solution in the children's best interests." *See In re Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016) ("Iowa courts have modified custody when shared custody provisions incorporated into the decree have not evolved as envisioned by either of the parties or the court or when the parents simply cannot cooperate or communicate in dealing with their children." (cleaned up)). The court recognized that the parents had struggled, but it did not believe they were incapable of self-improvement, noting that "the court observed on the witness stand two parents who love their children deeply and want to do what is best for them."

"A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered." *Id.* at 440. "The changed circumstances affecting the welfare of children and justifying modification of a decree 'must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.'" *Id.* (citation omitted). "The children's best interest is the 'controlling consideration.' Utilizing the best-interest standard 'provides the flexibility necessary to consider unique custody issues on a case-by-case basis.'" *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (citations omitted).

Second, the parent seeking an alternative custody arrangement "must . . . prove a superior ability to minister to the needs of the children." *Harris*, 877 N.W.2d at 440. "Iowa courts have generally affirmed or maintained joint custody arrangements for parents who demonstrate they are able to put aside their differences for the sake of their child or children." *Id.* (collecting cases). This is true even in cases rife with "tension, selfishness, and anger on the part of all the adults involved . . . ." *In re Marriage of Stafford*, 386 N.W.2d 118, 121 (Iowa Ct. App. 1986). Although the court did not expressly find there was a substantial change in circumstances since the decree was entered, the parties conceded that there had been and the findings of the court followed their concessions. But as a remedy, the district court did not change the custodial status; instead, the court crafted what it felt was a solution to the problem as defined by the parties.

Before trial, both parents behaved immaturely and showed more concern about one-upping each other than communicating as adults. But not shown in this

record was how the children's best interests were impacted in a way that warranted a change in custodial status. Both parents testified the children are doing well in school; received appropriate medical treatment; and for the most part were happy, healthy, and involved in activities. And although Elizabeth stated that she had requested counseling for the children, there was no specific testimony related to a child's condition that would be addressed. While counseling to address how to navigate the parental conflict might be in order, the record is lacking detail to aid our best-interests analysis. At the end of the day, so far the parties have effectively raised three healthy children who are close to both parents. The standard for modification does not stop at asking whether there was a material and significant change in circumstances, the standard asks whether such a change warrants modification because the child's best interests demands it. *Hoffman*, 867 N.W.2d at 32. This is an intentionally heavy burden to carry—"once custody of children has been fixed it should be disturbed only for the most cogent of reasons." *In Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

On a positive note, both parents have the skills and financial means to take care of their children and are devoted to being involved in their children's lives. The record reflects that both parents attended sporting events, doctor appointments, and parent-teacher conferences. Both love their children and seek to provide for their long-term physical and emotional needs, even if their actions fall short of the goal when emotions swell. Likewise, joint physical care remains in the best interests of the parties' children with a modified schedule to reduce disruption. We reiterate the findings of the district court, "[T]he best interests of

the children are served by the parents learning to put their children's best interest above their own feelings, which means learning[] to co-parent constructively."

We acknowledge the assessment of the GAL and the district court that the original parenting plan is simply not working.  The district court's physical care and parenting plan, where the children spend alternating weeks with each parent, is a reasonable modification that limits communication and unnecessary handoffs between the parties.  The district court's order, including the requirement that the parties use a parenting coordinator and parenting computer program, gives the parents the tools to constructively communicate for the care of their children.[1]

**Appellate Attorney Fees.**  Finally, both parties requested attorney fees. *See* Iowa Code § 598.36 (2022) ("In a proceeding for the modification of an order or decree under this chapter the court may award attorney fees to the prevailing party in an amount deemed reasonable by the court.").  "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (citation omitted).  Ross, who responded to Elizabeth's appeal by asking this court to maintain joint legal custody and joint physical care, was the successful party on appeal.  On top of that, Ross has a greater ability to pay fees with his higher income.  As a result, we do not award attorney fees to either party.

---

[1] At trial, Ross voiced his willingness to attend counseling to improve communication with Elizabeth.  From her perspective, Elizabeth believed Ross wanted counseling because he still harbored feelings for her and thus, she advocated against it.  A good parenting coordinator can steer the sessions towards appropriate parenting topics.

**IV. Conclusion.**

We affirm the decision of the district court.

**AFFIRMED.**